**FEDERAL TRADE COMMISSION,**
**Petitioner,**

**v.**

**GLAXOSMITHKLINE, Respondent.**

**No. 1:01MS163(RCL).**

United States District Court,
District of Columbia.

Oct. 9, 2001.

Melvin H. Orlans, Federal Trade Commission, Washington, D.C., for Petitioner.

Melvin A. Schwartz, Dechert Price & Rhoads, Washington, D.C., for Respondent.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

Now before the Court is the Federal Trade Commission's ("FTC") motion to enforce Specifications 1 through 11 of the subpoena duces tecum it issued to GlaxoSmithKline ("GSK") on December 14, 2000[26]. For the following reasons, the FTC's motion is GRANTED.

### I. Background

GlaxoSmithKline ("GSK"), formerly SmithKline Beecham ("SKB"), is a corporation that produces and sells the antidepressant drug paroxetine hydrochloride hemihydrate. Paxil, the brand name for the drug, is widely distributed throughout the world, with annual sales in the United States alone in excess of one billion dollars. GSK has a New Drug Application for Paxil on file with the Food and Drug Administration ("FDA") and is currently the only firm allowed by the FDA to sell the drug in the United States. With the upcoming expiration of some of GSK's patents, however, the company may soon face competition from several generic drug firms that have filed Abbreviated New Drug Applications.

The FTC is an administrative agency of the United States government that, pursuant to 15 U.S.C. § 41 et seq. ("FTC Act"), is authorized to prohibit unfair methods of competition in or affecting commerce. In particular, 15 U.S.C. § 43 enables the FTC to "prosecute any inquiry necessary to its duties in any part of the United States," 15 U.S.C. § 46 allows the FTC to "gather and compile information concerning, and to investigate ... corporation[s] engaged in or whose business affects commerce," and 15 U.S.C. § 49 empowers the FTC to "require by subpoena the attendance and testimony of

witnesses and the production of all such documentary evidence relating to any matter under investigation." Exercising the power granted to it in these provisions, and in accordance with the resolution of December 11, 2000, the FTC is investigating whether GSK has monopolized or is attempting to monopolize the market for paroxetine hydrochloride hemihydrate by preventing generic competition for its drug Paxil. Specifically, the FTC's investigation focuses on whether GSK is preventing generic competition by improperly listing patents in the FDA's compilation of "Approved Drug Products with Therapeutic Evaluations." According to the FTC, this action can potentially delay the marketing of generic paroxetine hydrochloride hemihydrate products for a significant period of time.

As part of its investigation the FTC issued a subpoena duces tecum to GSK on December 14, 2000. The subpoena requires the production of the following documents:

(a) Specification 12 requires production of all documents related to Paxil "that any court has ordered SKB [now GSK] to produce in any litigation despite a claim of privilege by SKB [GSK]." This specification covers several documents that GSK produced in a private patent lawsuit with Apotex, a generic pharmaceutical manufacturer. In that case, the District Court for the Northern District of Illinois (and the Federal Circuit) explicitly rejected GSK's claims of privilege and required GSK to produce the documents (the "Chicago documents").

(b) Specifications 1—11 of the subpoena require production, inter alia, of documents related to the manufacturing and marketing of Paxil, the listing and use of any patents regarding Paxil, and any filings with the FDA regarding Paxil.

On April 18, 2001, the FTC petitioned this Court, pursuant to 15 U.S.C. §§ 49 & 56, for an order requiring GSK to comply with the subpoena duces tecum issued to the company on December 14, 2000. By stipulated order entered on April 21, 2001, this Court decided first to review whether the documents requested in Specification 12, the so-called Chicago documents, are privileged. After re-

solving the privilege assertions with respect to those documents, the Court would then decide whether the documents requested in Specifications 1 through 11 are privileged.

On June 12, 2001, this Court found that the documents sought by the FTC under Specification 12 were not privileged, and accordingly ordered GSK to produce them. After GSK provided the FTC with the relevant documents, the parties attempted to resolve, without judicial intervention, the dispute concerning the documents sought under Specifications 1 through 11. After extensive discussions, GSK produced more than one hundred documents pursuant to a stipulation that the FTC would not assert subject matter waiver, and the FTC dropped its claim against several hundred documents. Nevertheless, there are still ninety-one documents that the FTC wants GSK to produce that the company asserts are protected by the attorney client privilege, the work product doctrine, or both. Thus, on August 17, 2001, the FTC filed a motion to enforce Specifications 1–11 of the subpoena it issued to GSK on December 14, 2000. The Court must now decide which, if any, of the documents fall within the ambit of the attorney client privilege or the work product doctrine.

## II. Discussion

GSK contends that it does not need to produce the following documents because they are protected by the attorney client privilege: # 62, # 89, # 90, # 91, # 96, # 102, # 142, # 147, # 191, # 192, # 204, # 206, # 208–210, # 216, # 217, # 219, # 241, # 285, # 318, # 320, # 324, # 433, # 436, # 437, # 444, # 454, # 460, # 461, # 472, # 473, # 478, # 484, # 486 [6/13/00], # 496–506, # 513, # 515, # 604, # 606, # 612, # 619 [5/13/98], # 644, # 645, # 648[7/28/96], # 649, # 650[12/10/99], # 651[12/10/99 & 12/12/99], # 658 [10/29/97], # 681, # 703, # 706, # 712, # 724, # 732 [5/13/98], # 744, # 758–761, # 792, # 793 [5/13/98], # 807 [7/28/96], # 820 [4/7/00], # 826 [5/13/98], # 877[10/8/99], # 878 [10/8/99], # 879 [10/8/99B], # 881 [10/8/99B], # 898 [10/8/99A], # 911, # 915, # 927, # 935 [all except 7/30/96], # 960, # 961, # 964, # 966, # 1019 [3/25/99], # 1027 [5/13/98], and # 1071. GSK claims that the following documents, in addition to being covered by the

attorney client privilege, are also protected by the work product doctrine: # 147, # 191, # 192, # 204, # 206, # 208–210, # 216, # 217, # 219, # 241, # 478, # 496–506, # 513, # 515, # 644, # 658 [10/29/97], # 681, # 703, # 706, # 793 [5/13/98], # 868 [5/14/00B]. The Court will first determine which of the documents, if any, are covered by the attorney client privilege. If the Court finds that the documents are protected by the privilege that is the end of the inquiry. GSK will not need to produce them. On the other hand, the documents that GSK asserts are only protected by the attorney client privilege will need to be provided to the FTC if the court finds that the documents are not privileged. For some of the documents that do not fall within the ambit of the attorney client privilege, however, the Court must also evaluate GSK's claim that they are protected by the work product doctrine. If the Court finds that the documents are protected by the work product doctrine, and that the FTC has not shown a substantial need for the documents and an undue hardship in obtaining them, then GSK will not need to produce the documents. Only after determining that neither the attorney client privilege nor the work product doctrine covers these documents will the Court order GSK to produce them.

## A.  Attorney Client Privilege

■ The attorney client privilege protects certain communications between clients and their attorneys from disclosure. While the privilege is well established, it is also narrowly construed. *Coastal States Gas Corp. v. DOE*, 617 F.2d 854, 862 (D.C.Cir. 1980). In particular, the privilege only applies if:

(1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of

committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*In re Sealed Case*, 737 F.2d 94, 98–99 (D.C.Cir.1984) (quoting *United States v. United Shoe Machinery Corp.*, 89 F.Supp. 357, 358–59 (D.Mass.1950)). Moreover, in order for the privilege to attach to an attorney to client communication, the claimant must show that "the lawyer's communication rested in significant and inseparable part on the client's confidential disclosure." *In re Sealed Case*, 737 F.2d at 99; *White v. United States Catholic Conference*, 1998 WL 429680 at *1 (D.D.C.) (noting that "it is unequivocally the law of this Circuit that the advice an attorney gives a client is protected by the attorney client privilege only if it discloses or tends to disclose what the client told the attorney in confidence."). Despite these restrictions on the attorney client privilege, the D.C. Circuit has explicitly noted that it "is not limited to communications made in the context of litigation or even a specific dispute, but extends to all situations in which an attorney's counsel is sought on a legal matter." *Coastal States Gas Corp. v. DOE*, 617 F.2d 854, 862 (D.C.Cir.1980). The reason for extending the privilege to encompass such communications, and in fact the purpose for the privilege in the first instance, is "to assure that a client's confidences to his or her attorney will be protected, and therefore encourage clients to be as open and honest as possible with attorneys." *Coastal States Gas Corp. v. DOE*, 617 F.2d 854, 862 (D.C.Cir. 1980) (noting also that "[u]ninhibited confidence in the inviolability of the relationship is viewed as essential to the protection of a client's legal rights, and to the proper functioning of the adversary process.").

■ In addition to satisfying the elements listed above, the party asserting the privilege must show that the communication has been "maintained as confidential between attorney and client." *Brinton v. Department of State*, 636 F.2d 600, 603 (D.C.Cir.1980); *Baxter Travenol Labs., Inc. v. Abbott Labs.*, 1987 WL 12919 at *5 (N.D.Ill.1987) (noting that where "confidentiality of a document is not maintained, the privilege is lost."). That is, "a fundamental prerequisite to assertion of

the privilege" is "confidentiality both at the time of the communication and maintained since." *Coastal States Gas Corp.*, 617 F.2d at 863. When the party asserting the privilege is a corporation, courts must pay particular attention to this requirement because not all corporate employees qualify as "clients" for purposes of the attorney client privilege. *In re PEPCO*, 1992 WL 310781 at *1–*2 (D.D.C.1992). The privilege is not lost, however, simply because there was some limited circulation beyond the attorney and the person within the corporation who requested the advice. *Coastal States Gas Corp.*, 617 F.2d at 863. Rather, the test for determining the applicability of the privilege "is whether the [corporation] is able to demonstrate that the documents, and therefore the confidential information contained therein, were circulated no further than among those members 'of the organization who are authorized to speak or act for the organization in relation to the subject matter of the communication.'" *Id.* (quoting *Mead Data Central, Inc., v. United States Dept. of Air Force*, 566 F.2d 242, 184 U.S.App. D.C. 350, 361 (D.C.Cir.1977)). Thus, as the D.C. Circuit found in *Coastal States Gas Corporation*, "[i]f facts have been made known to persons other than those who need to know them, there is nothing on which to base a conclusion that they are confidential." *Id. See also Baxter Travenol Labs.*, 1987 WL 12919 at *5 (recognizing that "[w]here the client is a corporation, the privilege is waived if the communications are disclosed to employees who did not need access to the communication.").

The burden of establishing the applicability of the attorney client privilege falls squarely on the party invoking its protection. *In re Sealed Case*, 737 F.2d at 99 (recognizing that "[i]t remains the claimant's burden, however, to present to the court sufficient facts to establish the privilege."); *FTC v. TRW*, 628 F.2d 207, 213 (D.C.Cir.1980) (stating that "[t]he burden is on the proponent of the attorney-client privilege to demonstrate its applicability."). For example, in *Alexander v. Federal Bureau of Investigation*, this Court held that the party asserting the attorney client privilege "fail[ed] to satisfy [his] burden of demonstrating the applicability of the privilege to the documents withheld" because he only provided the court with "general and conclusory declarations ...." *Alexander v. FBI*, 192 F.R.D. 42, 45–46 (D.D.C. 2000).

In support of its contention that these documents are protected by the attorney client privilege GSK submitted a privilege log that states who made the documents, when they were made, who they were sent to, and a brief description of what they contain. For example, the log shows that Gwynn Morgan, who according to a separate exhibit was VP/Director of Safety Assessment, created document # 89 on February 11, 2000. The log describes the document as a "[c]onfidential internal email regarding legal advice relating to the position to be taken with the FDA in connection with GSK's development of a paroxetine product." It further states that the email was sent to Stella Jones, who was VP/Director for ITR and Neurosciences Therapeutic Area. The log also lists eighteen other employees of GSK as recipients of the email. Those other individuals' job description ranges from in-house counsel to VP/Director of Chemical Development. The log does not, however, state why the email was sent to any of these individuals. In fact, the log fails to provide an explanation for why certain employees received copies of any of the allegedly confidential documents.

Another example from the privilege log is document # 881. The log states that Anne Bell, who is a Director and former leader of the Paroxetine Project Team, created the document on October 8, 1999. The document is described in the log as a "[c]onfidential internal email providing legal advice relating to the development of a paroxetine product." [1] The email was sent to several teams within GSK and to three other employees of GSK, including Peter Blower. Again, the log does not provide any explanation for why these other individuals received a copy of the

1. It is interesting to note that while document # 881 is described as an email that provides legal advice, according to another exhibit filed with the Court the author of the document is not an attorney.

email or why the individual members of the special project teams were sent a copy of the document. Moreover, a separate exhibit filed with the Court states that the job title for Peter Blower is not available. Thus, it is not only unclear why he was sent the email, but also what his role is at GSK.

In order to supplement, and in many respects explain, the contents of the privilege log, Charles M. Kinzig ("Kinzig") filed a declaration on September 10, 2001 with this Court. As Vice President and Director for Corporate Intellectual Property ("CIP"), Kinzig works in the legal department at GSK and is part of the group that has responsibility for overseeing the procurement, maintenance and protection of the intellectual property rights of the company. According to Kinzig, CIP regularly provides advice on patent, trademark, trade secret, copyright, and related intellectual property issues. In his declaration, Kinzig describes the general organizational structure of the company and the function of several special project teams that deal with matters concerning Paxil. On the issue of confidentiality, he states that:

> I have reviewed all of the documents that the FTC claims in its motion were "overbroadly" distributed. I disagree with the FTC's characterization for the reasons I have set forth here. These documents were disseminated to those within SB [now GSK] who needed to provide input to the legal department and/or receive the legal advice and strategies formulated by counsel. The documents were distributed to the person who fell in those categories. In some cases, documents were sent to the secretaries of the intended recipients, in addition to the intended recipients, because some managers work through their secretaries. This necessarily enlarges the distribution list, but does not indicate an overly broad distribution. The fact that on some occasions the number of distributees exceeded ten or even twenty demonstrates this, the worldwide scope of the paroxetine business and the need to coordinate efforts across both geographical and functional business units to keep the operations running effectively. My review of these documents confirms that they reflect the policy at SB [now GSK] not to disseminate confidential documents to personnel who have no reason to know or act on the legal advice and strategies in those documents.

Kinzig Decl. at 10.

The Court holds that despite submitting the privilege log and the declaration of Kinzig, GSK has failed to provide sufficient evidence that the disputed documents are covered by the attorney client privilege. In particular, the Court finds that GSK has not sustained its burden of demonstrating that the relevant documents were distributed on a "need to know" basis or to employees that were "authorized to speak or act" for GSK. The law in this circuit is clear: "[i]f facts have been made known to persons other than those who need to know them, there is nothing on which to base a conclusion that they are confidential." *Coastal States Gas Corp.*, 617 F.2d at 863. As stated above, the privilege log itself provides no explanation whatsoever for why any, let alone all, of the employees received copies of certain documents. Thus, there is no way for the Court to ascertain, based on the log, whether the allegedly confidential information contained in the documents remained confidential.

Moreover, the Kinzig declaration does not provide the Court with enough information about each document to support the conclusion that the documents were distributed on a need to know basis or to employees that were authorized to speak or act for the company. In his declaration, Kinzig states that GSK does not distribute confidential documents to employees unless they need access to them. He also provides the court with a detailed description of several project teams within GSK that received many of the documents. The problem is that Kinzig, like the privilege log, fails to explain why the documents were sent to specific individuals that are not a part of these teams or even to each member of the teams. Kinzig's explanation of how GSK distributes confidential documents is really nothing more than a conclusion that GSK in fact does distribute such documents on a need to know basis. In other words, the declaration only supplies the court with Kinzig's conclusion that the documents were distributed on a need to know

basis rather than providing the Court with evidence that would support the Court reaching that conclusion. For example, referring back to document number 89, which is discussed above, there is no way for the Court to ascertain why the additional eighteen individuals received copies of this email. It may very well have been permissible to distribute the email to all of those individuals without destroying the attorney client privilege. Based on the record, however, the Court cannot make that determination. And, as stated above, the burden for establishing that each document is covered by the attorney client privilege rests exclusively on the proponent of the privilege.

Another, and perhaps more fundamental, reason why the Court finds that the contested documents are not protected by the attorney client privilege is that GSK has failed to provide sufficient evidence that the information contained therein is confidential. Admittedly, each document is described as being confidential, but that proves nothing. As the proponent of the privilege, GSK has the burden of demonstrating that every single document contains confidential information that is protected by the attorney client privilege. To merely state that—as the log did for # 881 and countless others—a document provides or reflects legal advice is not sufficient to sustain the burden placed on the proponent of the privilege. Rather, the party invoking the privilege must demonstrate that the communication "rested in significant and inseparable part on the client's confidential disclosure." *In re Sealed Case*, 737 F.2d at 98–99. GSK has clearly failed to do that in either the privilege log or in Kinzig's declaration. GSK has also failed to provide any substantive evidence that the communications between its employees and counsel were made "for the purpose of securing primarily either (i) an opinion on law or (ii) legal services." *In re Sealed Case*, 737 F.2d at 98–

99. The Court will not simply assume that these documents contain such information. The burden is on GSK to prove it.[2]

## B. Work Product Doctrine

■ The work product doctrine, which was first articulated by the Supreme Court in *Hickman v. Taylor*, and later codified in Federal Rule of Civil Procedure 26(b)(3), protects from discovery "documents and tangible things ... prepared in anticipation of litigation or for trial." Fed. R. Civ. Pro. 26(b)(3). The purpose for the doctrine is to "enable[ ] a lawyer to develop his mental impressions and legal theories without fear of having adversaries rummage through them at leisure ...." *Senate of Puerto Rico v. DOJ*, 1993 WL 364696 at *5 (D.D.C.1993) (quoting *Delaney, Migdail & Young, Chartered v. IRS*, 826 F.2d 124, 126 (D.C.Cir. 1987)). *See also Hager v. Bluefield*, 170 F.R.D. 70, 76 (D.D.C.1997) (noting that the privilege "creates a zone of privacy within which an attorney can think, plan, weigh facts and evidence, candidly evaluate a client's case and prepare legal theories."). The doctrine does not apply to every written document generated by an attorney, rather it only covers documents prepared in anticipation of litigation. *Senate of Puerto Rico v. DOJ*, 823 F.2d 574, 586 (D.C.Cir.1987). As the D.C. Circuit recently stated, "[t]he 'testing question' for the work product privilege ... is whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *In re Sealed Case*, 146 F.3d 881, 884 (D.C.Cir. 1998). *See also In re Sealed Case*, 676 F.2d at 809 (stating that the work product doctrine protects any material obtained or prepared by a lawyer "in the course of his legal duties, provided that the work was done with an eye toward litigation."). The court went

---

2. GSK asserts that the following documents, which were either disclosed to, or sent by, third party consulting firms are protected by the attorney client privilege: # 96, # 102, # 472, # 473, # 486 [6/13/00], # 649, # 650 [12/10/99], # 651 [12/10/99] & [12/12/99]. The Court does not, however, need to address separately the question of whether such third party documents fall within the ambit of the attorney client privilege be-

cause even if they could, GSK has failed to sustain its burden of showing that these particular documents do for the reasons provided above. That is, even if such third party documents could qualify under the attorney client privilege, these particular documents would not because GSK has not shown that they contain confidential information or that they were only distributed to parties that needed to see them.

on to state that "[f]or a document to meet this standard, the lawyer must at least have had a subjective belief that litigation was a real possibility, and that belief must have been objectively reasonable." *Id.; EEOC v. Lutheran Social Services,* 186 F.3d 959, 968 (D.C.Cir.1999). The burden for showing that a document is protected by the work product doctrine, like the attorney client privilege, is on the party asserting its application. *Senate of Puerto Rico,* 1993 WL 364696 at *5.

In *Smithkline Beecham v. Apotex Corporation,* SmithKline asserted that the work product doctrine protected the so called Chicago documents, which were the same documents the FTC requested in Specification 12 of the December 14, 2000 subpoena. 193 F.R.D. 530, 540 (N.D.Ill.2000). In that case, like in the instant matter, SKB submitted a privilege log and supporting affidavits to the court in order to demonstrate the applicability of the privilege. At the outset Magistrate Judge Bobrick noted that in order to sustain their burden SKB would have to demonstrate a substantial and significant threat of litigation. *Id.* In concluding that the corporation had failed to do so, Judge Bobrick found that SKB "offer[ed] almost nothing in the way of evidence to suggest a threat of litigation or a resolve to litigate." *Id.* The judge explicitly found the affidavit of Mr. Russell, which used the phrase "possible future, or ongoing, paroxetine patent litigation" insufficient to sustain the burden. *Id.* at 541. That is, the Court held that "[s]uch speculation falls far short of 'objective facts establishing and identifiable resolve to litigate.'" *Id.* at 541. Furthermore, the court found that SKB could not have anticipated litigation prior to May 18, 1999 because that was when it became aware of Apotex's competing product. Accordingly, Judge Bobrick ordered SKB to produce the relevant documents.

SKB subsequently filed a Rule 72(a) objection to Magistrate Judge Bobrick's ruling with United States District Court Judge Kocoras. The district court, while reversing Judge Bobrick's findings with respect to four documents that were created for ongoing litigation prior to May 18, 1999, affirmed the magistrate judge's general ruling with respect to the May 18, 1999 cutoff. 2000 U.S. Dist. LEXIS 13606 (N.D.Ill.2000). In particular, Judge Kocoras stated that "[a]lthough Plaintiff's privilege log entries describe documents as having been prepared for or in connection with 'anticipated paroxetine patent litigation,' neither they nor the Russell affidavit set forth objective facts justifying such a characterization. That is, Plaintiffs never demonstrated, with anything more than conclusory statements, a substantial and significant threat of litigation . . . ." *Id.*

■ In the instant case, the Court holds that GSK has failed to sustain its burden of showing that the documents fall within the ambit of the work product doctrine. The Court finds that the description of the documents in the privilege log and the Kinzig declaration do not provide sufficient facts to satisfy the objective prong of the "in anticipation of litigation" requirement. In other words, GSK fails to set forth objective facts that support the corporation's assertion that the relevant documents were created in anticipation of litigation. GSK states that the documents refer "to potential legal action by GSK to enforce its patents" and that since the exclusivity period was due to expire at end of 1997, the company "anticipated that in 1998 generic pharmaceutical companies would file ANDAs with U.S. FDA . . .lead[ing] to U.S. ANDA patent litigation under 35 U.S.C. § 271(e)(2)." The problem with this description is that it does not state with any particularity why each document was created. A general, conclusory statement that litigation may occur sometime in the future is not sufficient to show that documents were created in anticipation of that potential litigation. GSK has focused almost exclusively on when the particular documents were created, rather than why they were created as required by the work product doctrine. Moreover, simply stating that the exclusivity period was going to end in 1997 is not sufficient evidence that the documents created around that time period were made in anticipation of litigation. The fact that litigation may potentially occur at a particular time does not mean that every document created around that date is made in anticipation of the litigation. It is, however, interesting to note that GSK uses the same broad description to characterize documents that

were made years before the exclusivity period was fixed to expire. The burden of showing that the relevant documents were prepared in anticipation of litigation is clearly on GSK. The company has failed to sustain that burden in the instant case.[3]

### III. Conclusion

For the foregoing reasons the Court finds that GSK has failed to show that the disputed documents are protected by either the attorney client privilege or the work product doctrine. GSK has not sustained its burden for any of the documents and accordingly cannot withhold them from the FTC. Therefore, the FTC's motion to enforce Specifications 1 through 11 of the subpoena duces tecum it issued to GSK on December 14, 2000 is hereby GRANTED. A separate order shall issue this date.

---

3. The FTC argues that GSK should be collaterally estopped from even asserting that documents made prior to May 18, 1999 were prepared in anticipation of litigation because of the rulings by Magistrate Judge Bobrick and District Court Judge Kocoras in the Apotex litigation. This Court will not address that issue because it finds that even if GSK is not precluded from asserting the privilege, it has failed to satisfy its burden of showing the applicability of the doctrine to the relevant documents. The Court thinks that it is important to note, however, that this is not a trivial issue. In deciding whether the so called Chicago documents were prepared in anticipation of litigation, Magistrate Judge Bobrick explicitly found that May 18, 1999 was the earliest date that SKB could have anticipated litigation. In the instant case, GSK has not provided any evidence indicating how these documents are substantively different from those at issue in the Apotex case. Thus, while the court will not, as stated above, rule on the collateral estoppel issue, GSK may very well be precluded from invoking the work product doctrine.

